DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KAREN KREUZKAMP (CABN 246151)
STEPHEN MEYER (CABN 263954)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7014
    FAX: (415) 436-7234
    Karen.Kreuzkamp@usdoj.gov
    Stephen.Meyer@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 17-CR-0068-008 EJD |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| GERBER MORALES, a/k/a "Choco," a/k/a "Chuki," | Sentencing Date: July 17, 2019<br>Time: 1:30 p.m. |
| Defendant. | |

    The government respectfully submits this sentencing memorandum to request that the Court sentence defendant Gerber Morales to 87 months of imprisonment, five years of supervised release, and a $200 special assessment. This sentence is at the top of the applicable Guidelines range, which is 70-87 months, but would be at the bottom of the Guidelines range without the two-point reduction for the safety-valve. Given that the defendant has been (and continues to be) a dedicated MS-13 gang member for at least 7 years, was part of a gang that was dedicated to committing acts of violence against rivals and threatening violence against others, personally possessed at least two firearms, attended at least 17 MS-13 gang meetings and held a

position of leadership for a short period of time, and was a key player in the gang's distribution of crystal methamphetamine in Santa Cruz since at least March 2015, the government believes that a sentence of 87 months is the lowest sentence necessary to achieve all of the goals of sentencing.

### I. Offense Conduct

As set forth in more detail in Probation's Presentence Investigation Report (the "PSR"), the defendant has been an active member of the Santa Cruz Salvatruchas Locos 13 ("SCSL") clique of the MS-13 gang for the last seven to eight years. (PSR ¶28). Even since his arrest on the instant federal case, the defendant has remained an active MS-13 gang member, albeit in a custodial setting rather than on the streets.[1]

It is undisputed that the MS-13 transnational gang is among the most violent and ruthless street gangs in the United States, and that its members rely on its violent reputation to control territory in which to conduct their drug trafficking and extortion activities and to dissuade witnesses from reporting their criminal activities to law enforcement. As a clique of MS-13, SCSL members committed acts of violence, including murder and extortion, and sold crystal methamphetamine for the benefit of their clique and the transnational MS-13 gang.

To carry out their violent crimes, the SCSL gang regularly collected money for firearms for the gang and passed around guns for use by SCSL members. At a meeting on March 21, 2015, defendant Morales collected the money.[2] Defendant Morales has admitted to carrying a firearm on at least one occasion in 2014. Defendant Morales was also given another gun by an

---

[1] Jail classification records reflect that defendant Morales has been classified as an active gang member during his entire time in custody. In addition, jail disciplinary records reflect that: (1) Morales admitted to possessing several pieces of metal (1 inch in length) in his cell on 9/29/18 for which he received an administrative sanction of 15 days lost privileges, (2) Morales was found to have been engaged in a fight in the jail on 8/16/18 (no other info is known to the government at this time), (3) Morales was found to have engaged in a planned attack with two of his co-defendants against a single individual on 3/16/18, and (4) on three separate occasions, Morales was found to be in possession of "pruno," for which he also received administrative sanctions.

[2] Defendant Morales was known to have attended at least 17 SCSL monthly meetings between May 2013 and January 2017. He was made the Number 2 in charge of SCSL for a short period of time in January 2016 until April 2016.

MS-13 member for safekeeping, and Morales later gave that gun to another MS-13 member who did not have a firearm available for his use. (PSR ¶¶ 28-29).

As a member of SCSL, defendant Morales and other MS-13 members participated in periodic armed patrols of their gang's turf to maintain control over that area. (PSR ¶28). SCSL also periodically went into rival gang territory to look for rivals to attack or threaten and intimidate. On July 15, 2016, defendant Morales and other MS-13 members went on patrol into the rival territory of the Beach Flat Sureños gang. The MS-13 members spotted an individual that they believed to be a rival gang member, and co-defendant Escalante-Torres shot the perceived rival. (PSR ¶42). Up until this point, the SCSL gang was known for typically attacking rivals with their fists or with knives and similar weapons, rather than by firing guns at them. From this point on, however, SCSL's participation in more extreme violence became their norm, ultimately culminating in the murder of a perceived rival on September 22, 2016. Defendant Morales was not directly involved in the planning or the execution of this murder. However, after this murder, several SCSL members, including Morales, received increasing pressure to commit a murder since they had not yet committed one. The government arrested defendant Morales and others on drug and extortion charges in order to disrupt their plans to carry out at least one additional murder.

As a member of SCSL, defendant Morales directly disciplined other members of SCSL by beating them for at least 13 seconds (the count to 13 usually takes significantly longer than 13 seconds). (PSR ¶29). These 13 second beat downs were a long standing MS-13 tradition, and were also used to initiate every new MS-13 member.

From at least April 2012, the SCSL gang was extorting people and selling drugs for the benefit of SCSL and MS-13 generally. Defendant Morales was not directly involved in the extortion activities, but was well aware of them since they were discussed at numerous SCSL meetings. (PSR ¶30).

From at least March 2015, defendant Morales was one of two SCSL members directly involved in selling crystal methamphetamine on behalf of SCSL. Between April 2015 and September 2015, defendant Morales sold over 50 grams of crystal methamphetamine to a

confidential informant working with law enforcement. Defendant Morales admitted that he in fact sold at least 150 grams of actual methamphetamine, but less than 500 grams of actual methamphetamine. (PSR ¶¶ 31-41). Among the SCSL gang members, defendant Morales was one of two members who were the most directly involved in dealing drugs.

## II. Guidelines Calculation

Based on the defendant's plea to Counts One (RICO conspiracy) and Three (conspiracy to distribute 50 grams and more of crystal methamphetamine), the parties agree that the Guidelines are calculated as follows:

a. Base Offense Level, U.S.S.G. §2E1.1(a)(2) (Racketeering)   32
(Most serious underlying racketeering activity: collective distribution of 150 grams or more of actual methamphetamine (§2D1.1))

b. Acceptance of Responsibility:   - 3
If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a three-level reduction for acceptance of responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of responsibility through and including the time of sentencing.

c. Adjusted Offense Level:   29

The parties contemplated that defendant Morales may be eligible for the safety-valve, which would allow him to escape the ten-year mandatory minimum for the drug charge, as well as obtain a two-level reduction from the applicable Guidelines. The government agrees that the defendant has now met all of the requirements for the safety-valve and therefore the Total Offense Level is 27. The defendant has a criminal history category of I, which results in a Guidelines range of 70 to 87 months. Without the two-level safety-valve reduction, defendant Morales's Guidelines range would have been 87 to 108 months, with a mandatory minimum sentence of 120 months.

The government has classified the defendants into two groups. Group One includes all of the defendants who were not directly involved in the conspiracy to murder Victim-2, five of whom have pled guilty. Group Two consists of all of the defendants who were directly involved in the conspiracy to murder Victim-2. With respect to Group One, three of the defendants were

charged with the drug conspiracy count, and three were not.  All six of these defendants Guidelines are based on the drug trafficking conspiracy, and the Total Offense Level is identical before the application of a potential safety-valve reduction.  However, in a twist of irony, only the defendants who were directly involved in the drug trafficking are eligible for the two-level safety-valve reduction.   Thus, the defendants most directly involved in the drug trafficking conduct are actually obtaining a lower Total Offense Level calculation.  The government, therefore, is considering both the Guidelines range before the safety-valve reduction and the Guideline range after the safety-valve reduction in evaluating the appropriate sentence for each of the defendants in Group One.[3]  Of course, the other 3553(a) factors also play a critical role in reaching the government's ultimate sentencing recommendation.

**III.     Other Section 3553(a) Factors**

The factors listed under 18 U.S.C. § 3553(a) indicate that a sentence at the top of the applicable sentencing Guidelines range is necessary to achieve the goals of sentencing.  The key 3553(a) sentencing factors in this case are the nature and circumstances of the offense and the history and characteristics of the defendant, 3553(a)(1), and the need for the sentence to afford adequate deterrence and protect the public from further crimes of the defendant, 3553(a)(2).

**A. Nature and Circumstances of the Offense**

The nature and circumstances of the offense are discussed above in the "Offense Conduct" section.  In addition, the Guidelines account for some of the relevant factors related to the defendant's offense conduct (e.g., the amount of drugs involved).  However, there are many other aggravating facts regarding the defendant's offense conduct that are not adequately addressed by the Guidelines.  The result is that the Guidelines do not provide increased punishment based on the following aggravating factors relating to the offense conduct:

(1) The defendant was an MS-13 gang member for at least 7 years, and regularly attend SCSL gang meetings at which they discussed their violent crimes and plans to

---

[3] The Guidelines range for the defendants in Group Two are driven by the murder of Victim-2 and the Base Offense Level begins at 43 for each of those defendants.  Thus, their Guidelines ranges are all at least approximately 20 years, with many of them being 30 years to life.

GOVT'S SENTENCING MEMORANDUM
NO. 17-CR-0068-008 EJD                              5

  commit further violent crimes, as well as collecting money for guns and to otherwise support their continuing criminal activity;

 (2) MS-13, including defendant's particular clique (SCSL), engaged in ongoing and significant violence against rival gangs, which ultimately culminated in a murder;

 (3) The defendant was directly involved in patrols of their turf for potential rivals or others to attack and/or intimidate;

 (4) The defendant was directly involved in patrols of rival gang territory to seek out rivals to attack, including one patrol in rival gang territory that led to the shooting of a perceived rival by one of the MS-13 gang members that was patrolling in the same car with defendant Morales;

 (5) The defendant personally possessed at least two guns on separate occasions, and provided one of the guns to another MS-13 gang member for his use, knowing that it would likely be used from violent crime; and

 (6) The defendant was directly involved in disciplining fellow gang members by beating them, and for a short period of time he was the Number 2 leader of the SCSL clique.

Thus, the offense conduct that is taken into account in reaching the Guidelines calculation for this defendant only accounts for the drug trafficking aspects of the RICO conspiracy. In doing so, it fails to account for large amounts of offense conduct that is far more troubling and which are aggravating factors for sentencing.

 If drug trafficking was the extent of defendant's offense conduct, the government might be in agreement with Probation's recommendation of a below-Guidelines sentence, given the social history that is a mitigating factor for sentencing. However, given the significant amount of aggravating factors that are not even reflected in the Guidelines calculation, the social circumstances are dwarfed when considering sentencing mitigation.

 **B. History and Characteristics of the Defendant**

 The offense conduct in this case, especially defendant Morales's long-time membership in MS-13, accounts for the most significant aggravating factor in the history and characteristics of the defendant. In addition, while he has been in custody on the instant case, defendant

Morales has committed several disciplinary offenses ranging from the possession of contraband such as "pruno" on three occasions and metal objects on another occasion, to engaging in jail fights, including one that was a planned attack by the defendant and two of his co-defendants against a single inmate.

On the other hand, a potentially mitigating aspect of the defendant's history and characteristics is his lack of prior convictions.  However, this potential sentencing mitigation is tempered by the fact that defendant Morales was actively engaged in criminal conduct for many years, but simply was not caught.  This is not a situation where the instant offense was an isolated incident or a brief foray into criminal activity by this defendant.  Defendant Morales joined a gang dedicated to violent crime and he demonstrated his commitment to the gang and its crimes by regularly attending meetings, providing money for guns and to otherwise support the gang, by personally possessing guns, by personally patrolling with the gang to attack rivals, and by selling crystal methamphetamine to further support the gang.

A truly mitigating aspect of the defendant's history and characteristics is his upbringing, which admittedly was tragic and likely contributed to his decision to join the violent MS-13 gang.  The defendant's father was murdered in El Salvador when the defendant was only three years old.  (PSR ¶69).  The defendant's mother was absent fighting in the civil war and later working in another city.  (PSR ¶71).  The defendant was raised by his grandparents, but his uncle regularly beat him, and even threatened him with a gun on one occasion when he was only about 12 years old.  (PSR ¶76).  The abuse finally stopped when Morales was old enough to defend himself, at age 15 or 16. (PSR ¶77).  Morales began drinking alcohol and smoking marijuana at a young age, and his abuse of alcohol was a problem until he stopped drinking about 5 years ago. (PSR ¶83-84). Morales also began using methamphetamine when he was 21 years old and used it two to four times a month. (PSR ¶83).

In the end, the government does not believe that this mitigation warrants a sentence below the very top of the applicable Guidelines range given the overwhelming number of aggravating facts.

The U.S. Probation Office's recommendation of a sentence of 60 months appears to be grounded solely in defendant Morales's abuse as a child and his use of marijuana and alcohol at a young age.  However, Probation fails to adequately account for the multitude of aggravating factors and does not balance them against this mitigating factor.  Probation's recommendation seems to be based on a classification of this defendant as simply another drug dealer, and then makes a wholesale rejection of the sentencing Guidelines calculation for drug offenses, and fails to account for all of the other criminal conduct by this defendant that makes up the RICO conspiracy offense conduct.  The PSR recommendation recites what appear to be aggravating sentencing factors – the seriousness of the offense, but only highlighting his involvement in selling crystal methamphetamine – and also recites what appear to be mitigating factors – personal history of abuse.  However, aside from reciting these factors, there is no explanation for how these factors, on balance, justify such a large sentencing reduction below the applicable Guidelines range.

Probation's recommendation was also made without knowledge of defendant Morales's in-custody violence and other jail rule violations.  Perhaps by the government highlighting the aggravating factors of the offense conduct, and providing the new information about his in-custody conduct, Probation will reconsider its recommendation.  In any event, the Court should not follow Probation's current recommendation and vary downward from the sentencing Guidelines based solely on his history of a very difficult and abusive childhood.  This one mitigating factor should not counterbalance all of the aggravating facts in this defendant's case.  Moreover, to the extent that one may argue that his bad childhood makes him somewhat less blameworthy for becoming the man who got involved in gangs and committed the crimes in this case many years after the abuse ceased, logic dictates that it also makes him a greater risk for recidivism.

### C. Protection of the Public and Deterrence

Specific deterrence and general deterrence are both significant goals of sentencing.  A significant sentence is necessary to deter this defendant from future crimes and to assist him in

making the sustained choice to comply with the law and distance himself from gangs and crime once he is released from custody.

In addition to specific deterrence, general deterrence warrants a significant sentence in this case. The defendant's criminal activity included directly supporting the criminal activities of his fellow gang members, which on one occasion led directly to the shooting of a perceived rival: Victim-1. More generally, the defendant supported the gang by contributing money for guns and storing one firearm and then passing it on to another MS-13 member who did not have a gun for his use. The gang ultimately committed a murder: Victim-2.

Gangs are successful in large part because their members engage in criminal activity in concert. The conspiracy to engage in such concerted criminal activity on an ongoing basis, including crimes of violence, drug trafficking, and use and possession of firearms, presents a substantial threat to the communities in which the gangs operate. As a result, significant punishment is needed for all violent gang members to deter membership and support for such criminal enterprises. The RICO statute is uniquely suited to provide such a deterrent to those who aid and abet and conspire to commit these types of ongoing criminal activities. However, the statute must be sufficiently enforced at sentencing to carry out its full potential for deterrence (both for the specific individual and for others generally).

**IV. Conclusion**

Considering all of the 3553(a) sentencing factors, the government respectfully recommends a sentence of 87 months' imprisonment, a five-year term of supervised release, and a $200 special assessment.

Dated: July 10, 2019

DAVID L. ANDERSON
United States Attorney

               /s/
STEPHEN MEYER
KAREN KREUZKAMP
Assistant United States Attorneys